IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHRISTOPHER MIDGETT, individually and on behalf of similarly-situated persons, ) ) ) ) | CASE NO.: 8:18-CV-00238 |
| Plaintiffs, ) ) | **DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| v. ) ) | |
| WERNER ENTERPRISES, INC., ) ) | |
| Defendant. ) | |

I.      **Introduction**

In January, 2015, after driving for three years as an employee / company driver for Werner, Plaintiff elected to become an independent contractor / owner operator driver for Werner. Unlike company drivers, who deliver freight using trucks owned by Werner and have their expenses paid by Werner, owner operators are small business owners who deliver freight for Werner's customers using their own trucks and pay their own expenses. Plaintiff selected the truck he purchased from Werner with no money down, and started driving as an owner operator without giving any thought to his fuel costs, maintenance costs, or ways to reduce those costs. The only preparation Plaintiff did before becoming an owner operator was to speak with a few other Werner owner operators, who told him they liked being owner operators and he would make more money as an owner operator.

In May, 2018, Plaintiff filed this lawsuit, alleging that he and other owner operators should have been classified as employees rather than independent contractors and because Werner did not pay his expenses while he was an owner operator, there were weeks when he made less than minimum wage. Yet Plaintiff continued to drive for Werner as an owner operator for over a year after he filed this lawsuit and, in June, 2019, rejected Werner's offer of employment to go back to being an employee / company driver. Plaintiff's Second Amended Complaint asserts claims for failure to pay minimum wage under the Fair Labor Standards Act ("FLSA") and the

Nebraska Wage Payment & Collection Act ("NWPCA"), as well as a common law claim for unjust enrichment. Plaintiff claims Werner intentionally misclassified owner operators in an effort to pass its business expenses off to Plaintiff and putative class members and "offload its aging fleet of trucks onto unsuspecting employees." (Filing 60, Second Amended Complaint, ¶2). Plaintiff seeks to certify a collective action under the FLSA and a class action under Rule 23(b)(3), consisting of drivers who participated in Werner's owner operator program within 3 years before the Complaint was filed (for the FLSA claim) or four years (for the Nebraska claims), using trucks purchased or leased from Werner.

Plaintiff's claims are not suitable for class treatment because the test for whether a worker is an employee or an independent contractor is a fact-intensive analysis that cannot be evaluated classwide in this case. Also, the amount of net pay received by any particular owner operator, after deducting expenses, will necessarily depend on the decisions he made in operating his business, including whether and how frequently he rejected loads, how he managed expenses, and which services he elected to receive from Werner and the corresponding cost of those services. There is no classwide method for determining whether drivers made less than minimum wage in any given week. A collective or class action is also not the superior means for adjudicating Plaintiff's claims because absent class members cannot protect their rights simply by choosing not to join the collective action or opting out of a Rule 23(b)(3) class. Although this lawsuit has been on file since May, 2018, Plaintiff has not spoken to a single other owner operator who shares his concerns. In fact, the only owner operators with whom Plaintiff has spoken told Plaintiff they made more money working as owner operators and they enjoyed the additional freedoms associated with being their own bosses. Other owner operators identified by Werner have affirmed they do not want to be classified as employees. However, they and other Werner owner operators cannot protect their rights simply by choosing not to join the class because Plaintiff's claim, by its very nature, seeks to change the structure of Werner's entire owner operator program.

Plaintiff's state law claims similarly turn on individual proof of the terms of each driver's Contractor Operating Agreement with Werner and each driver's subjective expectations. Plaintiff's Motion for Class Certification should be denied.

## II.     Background

### A.     Plaintiff bought a truck and went into business for himself.

In January 2015, Plaintiff decided to purchase a truck and go into business for himself as an independent owner operator delivering loads for Werner's customers. (Ex. 1, Deposition of Plaintiff Christopher Midgett ("Plf. Depo.") 27:22-24, 30:24-31:4). Plaintiff began his driving career 3 years earlier, when he obtained his CDL and began working for Swift Transportation. (Plf. Depo. 10:2-12). Before obtaining his CDL, Plaintiff was unemployed for 3 years. (Plf. Depo. 9:12-10:1). Plaintiff drove for Swift for 6 months and then left to drive for Werner. (Plf. Depo. 10:13-11:2). Plaintiff preferred driving for Werner because he got home more frequently than he did with Swift, but he became burned out on being an over-the-road trucker after about 3 months with Werner. (Plf. 14:5-14, 16:5-10, 16:20-17:1). Plaintiff resigned from Werner in July 2013, but returned 2 weeks later. (Plf. Depo. 16:5-10, 18:7-10, 19:7-10).

Plaintiff joined Werner's owner operator program in January, 2015, after speaking with other owner operators who told him he could "be [his] own boss" and make more money as an owner operator. (Plf. Depo. 31:19-32:9). Plaintiff understood there was risk involved in owning and operating his own truck and he would be responsible for paying the expenses for operating his truck. (Plf. Depo. 32:15-18, 36:25-37:19, 38:4-13, 92:2-4, 141:12-14; Ex. 1 to Plf. Depo., Contractor Operating Agreement ("Plf. First Agreement") at §§ 10, 14, 16, 17).

### B.     Owner operators have different management skills and they operate their businesses differently, which impact the amounts they earn.

Because owner operators are business owners, the amounts they spend and their net revenue are necessarily driven by their differing skill levels in operating a business. For example, as Werner's Senior Director of Accounting Administration explained, certain Werner owner operators always make a profit even after deducting all expenses, while certain other owner operator drivers make little or no profit after deducting their expenses. (Filing 66-2, Deposition of Steven Tisinger ("Tisinger Depo.") 67:5-14). Consistent with that testimony, Plaintiff's ability to manage his business and the decisions he made when managing his business differed from other owner operators, three of whom–Jay Brayman, Michael Tew, and Shawn Jackson–were

3

disclosed by Werner but never deposed by Plaintiff. (Ex. 6, Declaration of Sarah L. (Sally) McGill ("McGill Dec.") at ¶3 and Exhibit A).

### 1. Owner operators have different levels of experience and training.

When he became an owner operator, Plaintiff had 3 years of driving experience operating a commercial motor vehicle and no experience as an owner operator. (Plf. Depo. 10:3-14, 27:22-25). Before he bought his truck, Plaintiff had no idea how much his fuel costs would be as an owner operator; in fact, he did not even think about fuel costs before he decided to become an owner operator. (Plf. Depo. 45:13-21). Plaintiff also did not give any thought to what his truck maintenance costs and repair costs would be once he became an owner operator. (Plf. Depo. 64:16-19). Plaintiff later learned that how he operated his truck had an impact on his fuel and maintenance costs. (Plf. Depo. 66:2-10). For example, Plaintiff learned he might make more money if he shopped around for better fuel prices and performed preventative maintenance, such as changing the oil on a regular basis. (Plf. Depo. 93:22-94:20).

Unlike Plaintiff, Michael Tew was a Werner company driver for almost 7 years before he decided to go into business for himself and became an owner operator. (Ex. 2, Declaration of Michael Tew ("Tew Dec."), ¶4). Jay Brayman had about 9 years of driving experience, including about 2 years as a Werner company driver, when he decided to become an owner operator. (Ex. 3, Declaration of Jay Brayman ("Brayman Dec."), ¶4). Shawn Jackson joined Werner as an owner operator without ever having worked for Werner as a company driver. (Ex. 4, Declaration of Shawn Jackson ("Jackson Dec."), ¶4). However, because Jackson worked as an owner operator for another company, he had prior experience in managing fuel prices, selecting routes, and planning his home time to be successful as an owner operator, while other owner operators, like Plaintiff, learned on the job. (Jackson Dec. ¶4; Plf. Depo. 66:2-10).

### 2. Owner operators make different decisions about their trucks.

Owner operators buy different makes, models, and ages of trucks. (Plf. First Agreement at Addendum A (WRN-Midgett 00000013); Ex. 9 to Plf. Depo., Contractor Operating Agreement ("Plf. Second Agreement") at Addendum A (WRN-Midgett 00007608); Brayman Dec. ¶6; Tew Dec. ¶6). Plaintiff purchased a truck from Werner

because Werner offered him the best deal, and he could not afford to purchase a truck anywhere else. (Plf. Depo. 63:23-64:7, 174:13-18). Plaintiff selected his truck, a Freightliner Cascadia, because he liked the color and was familiar with that make and model. (Plf. Depo. 60:24-61:7). Plaintiff's truck had 384,247 miles when he purchased it from Werner, which he agreed was "low mileage for a truck." (Plf. Depo. 62:15-63:1).

Unlike Plaintiff, Michael Tew initially purchased a Freightliner Classic due to its spacious interior and later purchased an International Pro-Star because it was smaller and more aerodynamic. (Plf. Depo. 61:8-17; Tew Dec. ¶¶5-6). Jay Brayman considered other factors, such as the extent of the warranty left on the truck, when he purchased his truck from Werner. (Brayman Dec. ¶6). Unlike Plaintiff, Jay Brayman also had his truck inspected before he purchased it, which, according to Brayman, is part of a driver's standard due diligence. (Brayman Dec. ¶6). Because Werner is known to take exceptionally good care of its trucks, it is not unusual for an owner operator to purchase more than one used truck from Werner during the course of his or her career. (Brayman Dec. ¶5; Tew Dec. ¶5).

The age and condition of each owner operator's truck necessarily differs, from driver to driver and truck to truck. (Tew Dec. ¶¶5-6; Brayman Dec. ¶6; Plf. Depo. 61:8-9, 62:15-22). The mileage on each truck and the purchase price also vary. (Ex. 5, Declaration of Steven K. Tisinger ("Tisinger Dec.") ¶6). The pay arrangements also vary: some owner operators pay cash for their trucks, others take out a loan, and others pay for their trucks through a combination of cash and financing. (Filing 66-3, Deposition of Chad Dittberner ("Dittberner Depo.") 99:21-22). Plaintiff did not put any money down when he purchased his truck from Werner and instead opted to finance the entire amount. (Plf. Depo. 63:23-64:7; Ex. 3 to Plf. Depo., Purchase Order ("Purchase Order") (WRN-Midgett 00000405-00000407)). If an owner operator finances the truck, they may do so either through Werner or an outside lender. (Tew Dec. ¶6; Tisinger Dec. ¶5). The amounts owed by owner operators on their trucks and their weekly truck payments, if any, vary from driver to driver. (Tisinger Dec. ¶7). Some owner operators choose to accelerate their truck payments to pay off their truck earlier than other drivers. (Tisinger Dec. ¶8; Purchase Order at WRN-Midgett 00000405).

Some owner operators choose to modify the appearance of their trucks, by adding chrome bumpers, mud flaps, or other exterior details, and by adding fixtures inside the truck, such as refrigerators. (Brayman Dec. ¶9; Tew Dec. ¶10). While Brayman has not made any modifications, Tew made several modifications to his truck to increase his personal comfort over the road. (Brayman Dec. ¶9; Tew Dec. ¶10). Owner operators also have the option of removing the governor that is required for Werner company trucks. (Brayman Dec. ¶16; Ex. 2 to Plf. Depo., Governor Acknowledgment, WRN-Midgett 00000453 ("Governor Acknowledgment")). The governor limits company drivers' speed to no more than 65 miles per hour. (Brayman Dec. ¶16; Governor Acknowledgment). Although Plaintiff signed an Acknowledgment Form stating he could remove the governor, he apparently did not understand that form and did not remove the governor. (Governor Acknowledgment; Plf. Depo. 58:9-59:15). By contrast, Brayman removed the governor from his truck so he could drive faster and cover more miles in a shorter period of time. (Brayman Dec. ¶16).

Plaintiff paid off the truck he purchased from Werner in August, 2018. (Tisinger Dec. ¶11). He later traded in that truck and purchased a different truck from a Freightliner dealership in Kansas City. (Plf. Depo. 104:7-10, 18-21, 105:5-13, 108:5-10). The Freightliner truck had considerably more miles (446,219 miles) than the truck Plaintiff purchased from Werner (384,247). (Plf. Depo. 62:15-18, 110:12-17). Although Plaintiff claims he did not make minimum wage during certain weeks while driving as an owner operator, Plaintiff made a $2,000 cash deposit and received $11,000 in trade-in value for his old truck when he bought his new truck from Freightliner. (Plf. Depo. 111:24-112:3). By contrast, when Plaintiff purchased his truck from Werner in January, 2015, he did not have any money to put toward a deposit and financed the entire purchase price. (Tisinger Dec. ¶9; Ex. 3 to Plf. Depo., Purchase Order).

### 3. Owner operators have different options when entering into the Contractor Operator Agreement and make different decisions about how to efficiently manage their businesses.

Each owner operator voluntarily enters into a Contractor Operating Agreement with Werner, under which the owner operator makes many different choices about how to operate his or her business. (Plf. First Agreement; Filing 66-2, Tisinger Depo. 42:14-

43:17; Plf. Depo. 46:4-8). Since 2015, there have been two different versions of Werner's Contractor Operating Agreement in effect at various times and there are multiple different versions of the Addenda to the Agreement. (Tisinger Dec. ¶¶13, 16; Ex. B and Ex. C to Tisinger Dec.). The Addenda set forth the specific terms of each owner operator's business relationship with Werner, including the rates of pay and the deductions to which that driver agreed. (Ex. 1 to Plf. Depo., Plf. First Agreement, at WRN-Midgett 00000013-00000018; Ex. 9 to Plf. Depo., Plf. Second Agreement, at WRN-Midgett 00007608-00007624; Tisinger Dec. ¶16). For example, Plaintiff elected to purchase bobtail insurance, property damage insurance, and worker's compensation insurance from Werner, with corresponding monthly deductions for those coverages, but opted out of optional health insurance and vision insurance and the corresponding deductions for those coverage. (Ex. 1 to Plf. Depo., Plf. First Agreement, at WRN-Midgett 00000015-00000016; Ex. 9 to Plf. Depo., Plf. Second Agreement, at WRN-Midgett 00007619). Other owner operators may have elected to purchase those coverages elsewhere or elected to purchase health or other optional insurance from Werner, or may have made other similar business decisions specific to their own personal needs. (Tisinger Dec. ¶18; Tew Dec. ¶12; Brayman Dec. ¶12; Jackson Dec. ¶9). Certain owner operators have entered into multiple different Contractor Operating Agreements during the class period and made different choices in those different Agreements about the deductions they wanted. For example, when he signed his Contractor Operating Agreement in January, 2015, Plaintiff elected to contribute six cents per mile toward a maintenance escrow fund. (Ex. A to Tisinger Dec. at WRN-Midgett 00000449). However, when he signed a new Contractor Operating Agreement in March, 2019, Plaintiff elected to contribute three cents per mile to a maintenance escrow fund. (Ex. 9 to Plf. Depo., Plf. Second Agreement, at WRN-Midgett 00007609). Not only do the Contractor Operating Agreements and Addenda differ from driver to driver, but there have been at least 11 different versions of the Owner Operator Handbook in effect since 2015, with differing terms and requirements depending on the time period at issue. (Tisinger Dec. ¶20).

### a.   Owner operators manage truck maintenance and repairs differently.

Under the Agreement, owner operators select where and how to perform truck maintenance and repairs. (Ex. 1 to Plf. Depo., Plf. First Agreement at §§ 2, 10(B) and Addendum C at §§ 1, 2; Plf. Depo. 56:17-23, 57:17-22). They may choose to have maintenance and repairs performed at a Werner shop, or at an independent shop, or they may perform the maintenance themselves. (Plf. First Agreement at Addendum C at § 1; Filing 66-3, Dittberner Depo. 103:1-9). Although Plaintiff initially claimed he "had to" take his truck to Werner shops for maintenance, he ultimately admitted Werner's repair shops were the cheapest option and he just did not have enough money to take his truck elsewhere for repairs. (Plf. Depo. 56:24-57:12). Contrary to Plaintiff's testimony that he "had to" have his truck repaired at Werner's shops, other owner operators performed their own truck maintenance or chose to have repairs done at non-Werner shops. (Filing 66-3, Dittberner Depo. 103:1-0).

Owner operators may purchase tires anywhere, including through Werner. (Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C at § 6). Plaintiff purchased tires from Werner for the truck he bought from the Freightliner dealership, while other owner operators purchased tires elsewhere. (Plf. Depo. 116:18-117:2).

Under the Agreement, owner operators have the option to establish a maintenance escrow fund to save for truck maintenance and repair costs in advance. They can do so by directing Werner to deduct an amount ranging anywhere from three to ten cents per mile from their pay each week. (Ex. 9 to Plf. Depo., Plf. Second Agreement, at WRN-Midgett 00007609). That money is held in an interest-bearing account that is available for the owner operator to use for truck repairs. (Plf. Second Agreement, at § 26.2 and Maintenance Escrow Fund Election Form (WRN-Midgett 00007609); Filing 66-2, Tisinger Depo. 45:21-25). In May, 2019, Plaintiff chose the lowest cents-per-mile option, electing to set aside three cents per mile for truck maintenance and repairs. (Ex. 9 to Plf. Depo., Plf. Second Agreement, at WRN-Midgett 00007609). Other drivers elected to have more money set aside in their optional escrow accounts or saved for maintenance and repair costs in personal accounts. (Tew Dec. ¶11). For example, Tew currently elects to have Werner deduct ten cents per mile from

his pay each week, which is more than three times the amount Plaintiff chose to withhold in May, 2019. (Compare Tew Dec. ¶11 with Plf. Second Agreement, at Maintenance Escrow Fund Election Form (WRN-Midgett 00007609)).

Because Plaintiff had not saved enough money for truck repairs, he took out loans from Werner to pay for repairs on two occasions. (Plf. Depo. 67:23-25, 69:25-70:7; Ex. 4 and 5 to Plf. Depo., Advancement Addenda at WRN-Midgett 00000022-00000024, 00000019-00000021). Tew and Jackson have never taken a loan to pay for truck repairs or maintenance. (Jackson Dec. ¶7; Tew Dec. ¶9). While Brayman took out a loan to pay for a repair when he first began driving as an owner operator, he later paid Werner back in full. (Brayman Dec. ¶8).

Plaintiff owned his first truck for approximately four years before he traded it in because the "engine blew up" and he could not afford to have it repaired. (Plf. Depo. 104:18-105:7; Ex. 3 to Plf. Depo., Purchase Order at WRN-Midgett 00000405; Ex. 10 to Plf. Depo. at WRN-Midgett 00003003). In Brayman's and Tew's experience, however, trucks may last 1,000,000 miles or more with regular maintenance. (Brayman Dec. ¶6; Tew Dec. ¶6). For example, Tew conducts regular preventative maintenance on his truck and he has driven the same truck for 7 years. (Tew Dec. ¶6).

### b. Owner operators may obtain insurance from different providers under the Agreement.

Owner operators make different choices under the Agreement about whether and where to buy certain forms of insurance and those decisions impact the amounts withheld from their pay. (Ex. 1 to Plf. Depo., Plf. First Agreement at § 24 and Addendum C at § 4). They may, but are not required to, obtain workers' compensation coverage through Werner. (Plf. First Agreement at § 24 and Addendum C at § 4; Ex. A to Tisinger Dec. at WRN-Midgett 00000452, Individual Lessor - Workers' Compensation Coverage Agreement). Owner operators also make different decisions about how to obtain bobtail insurance[1] or physical damage insurance for their truck and may, but are not required to, obtain that insurance through Werner. (Plf. First Agreement at § 24 and Addendum C at

---

[1] Bobtail insurance covers damage to an owner operator's truck that occurs when the owner operator is not hauling a load for a customer. (Filing 66-2, Tisinger Depo. 47:20-48:4).

§ 4). Owner operators also decide whether to obtain medical, dental or vision benefits, and they may ask Werner to deduct premium payments from their pay for those coverages, which Werner then pays directly to the insurance provider. (Plf. First Agreement at Addendum C at § 4).

### c. Owner operators also make different decisions about whether to elect other optional services.

Owner operators may, but are not required to, obtain toll passes/cards or transponders; if they choose to do so, they may do so on their own or may use cards/passes or transponders available from Werner. (Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C at § 5). Some, but not all, owner operators choose to use the accounting services of Larsen & Associates ("Larsen"), a third party accounting firm. (Filing 66-2, Tisinger Depo. 44:12-18). Those owner operators who choose to use Larsen for their business accounting needs may request that Werner deduct Larsen's fee from their pay and may direct Larsen to instruct Werner to deduct income, self-employment, and highway use taxes. (Ex. A to Tisinger Dec., at WRN-Midgett 00000450 ("Settlement Deduction Authorization"); Filing 66-2, Tisinger Depo. 45:3-10). Plaintiff chose to utilize Larsen's services and had corresponding deductions from his pay. (Settlement Deduction Authorization; Ex. 6 to Plf. Depo. at WRN-Midgett 00000701, 00000635). Approximately 30-40% of Werner's owner operators do not use Larsen for their accounting needs. (Filing 66-2, Tisinger Depo. 44:12-18). Some, but not all, owner operators enroll in a legal services program to assist with legal defense of fines or tickets and request that Werner deduct the fees for that service from their pay. (Settlement Deduction Authorization, Tisinger Dec. ¶18; Jackson Dec. ¶9).

### d. Owner operators may accept or reject loads and decide how often they will haul loads.

Under the Agreement, owner operators may choose to refuse any load for any reason and are not penalized for doing so. (Agreement, § 1; Jackson Dec. ¶13, Brayman Dec. ¶17; Filing 66-3, Dittberner Depo. 77:5-19, 81:3-6; Plf. First Agreement, § 1). Owner operators have different preferences regarding which loads to accept and some inform Werner about their load preferences in advance, such as the locations where they prefer to drive or their willingness to "deadhead" (i.e., drive without freight) to other locations to

pick up loads. (Filing 66-3, Dittberner Depo. 77:13-16, 80:20-81:2; Tew Dec. ¶17; Brayman Dec. ¶19; Jackson Dec. ¶15).

As an owner operator, Plaintiff could, and often did, refuse loads Werner offered him. (Plf. Depo. 49:12-20, 50:15-18, 98:15-17; Filing 66-3, Dittberner Depo. 100:18-101:8). For example, Plaintiff chose to only haul loads lighter than 41,000 pounds, although he could have legally hauled heavier loads, and Plaintiff also informed Werner that he only wanted to drive in certain regions of the country. (Filing 66-3, Dittberner Depo. 77:21-78:3, 100:22-101:4). Had Plaintiff not refused certain loads and limited the areas where he was willing to drive, he could have hauled more loads. (Filing 66-3, Dittberner Depo. 101:1-8). Unlike Plaintiff, Jackson, Brayman and Tew did not place a weight limit on their loads. (Brayman Dec. ¶18, Tew Dec. ¶17, Jackson Dec. ¶14). Jackson rarely rejects loads, but has done so on occasion to avoid bad weather or hilly terrain with a heavy trailer. (Jackson Dec. ¶14). Brayman has occasionally rejected loads to avoid long wait times or difficult customers. (Brayman Dec.¶18). Tew rarely rejects loads, but did so once in downtown Chicago during a rainstorm when he could not find the pickup location. (Tew Dec. ¶17).

Owner operators also make different choices about when and how often they drive, how frequently they go home, where they travel within the United States, and other similar choices that impact how frequently they haul loads for Werner. (Filing 66-3, Dittberner Depo. 99:12-21). Since May, 2019, under the latest version of the Contractor Operating Agreement, owner operators also have the option to haul loads for other carriers under certain circumstances. (Filing 66-3, Dittberner Depo. 53:1-22; Filing 66-2, Tisinger Depo. 81:10-24; Ex. B to Tisinger Dec. at § 3).

### e. Drivers take different routes and manage fuel costs differently.

Unlike company drivers, owner operators decide which route to take to deliver a load. (Ex. 1 to Plf. Depo., Plf. First Agreement, § 10(C)). Although Werner provides a suggested route, owner operators are not required to, and do not always, follow the suggested routes. (Jackson Dec. ¶16; Filing 66-3, Dittberner Depo. 99:23-100:5, 106:3-7; Agreement, §10.c). Jackson uses a number of different tools, including GPS and cell phone apps, when deciding which route to take. (Jackson Dec. ¶16).

Owner operators also make different choices about where and when to fuel their trucks and may use different strategies to manage their fuel expenses, such as electing to use a Werner fuel card to purchase fuel at discounted prices. (Plf. First Agreement, § 14 and Addendum at § 1; Filing 66-3, Dittberner Depo. 103:1-21). Initially, Plaintiff did nothing to manage his fuel costs and did not even think about what his fuel costs would be before he entered into the Agreement. (Plf. Depo. 45:4-21). As time went on, Plaintiff learned he should "check fuel prices" to manage his fuel costs. (Plf. Depo. 93:23-94:3). By contrast, Jackson utilizes several strategies to manage his fuel, including but not limited to opting for the shortest route, even if a highway may be faster; driving at lower speeds when possible; researching fuel stops during the pre-trip planning; and avoiding fueling in states where gas is more expensive. (Jackson Dec. ¶11). Jackson may also drive out of route to purchase fuel if he determines it will be more cost efficient to travel a few miles off his selected route to buy fuel at a lower price. (Jackson Dec. ¶11). Although he will drive anywhere in the country, Tew requested that Werner avoid assigning him loads in the northeast, where fuel is more expensive. (Tew Dec. ¶17). Tew has also researched other options to help manage fuel costs, such as by improving aerodynamics with air tabs on his truck or installing specialized mud flaps. (Tew Dec. ¶14).

### 4.   Owner operators' profitability varies depending on how they manage their business and how much they are willing to work.

An owner operator's profitability varies depending on the choices the driver makes and the amount of miles they are willing to drive. (Filing 66-2, Tisinger Depo. 67:5-12). Generally, the more miles an owner operator drives, the more he or she earns. (Plf. Depo. 90:23-25). Owner operators can also make more money by training less experienced drivers ("student drivers") because the student driver gets paid a salary and the driver trainer gets paid for all miles driven by both the student driver and the driver trainer. (Ex. 1 to Plf. Depo., Plf. First Agreement at Training Addendum, § 6 (WRN-Midgett 00000018); Brayman Dec. ¶15). Although Brayman increased his revenue by becoming a trainer, Plaintiff chose not to participate in Werner's driver trainer program. (Plaintiff Depo. 48:13-23; Brayman Dec. ¶15).

      **a.**    **The deductions taken from a driver's pay will necessarily depend, in part, on the optional services, if any, that the particular driver elected to purchase.**

Contrary to Plaintiff's argument that "all owner operators are subject to the same deductions," the deductions made from an owner operator's pay vary from driver to driver, depending on the optional services and programs the owner operator selects in the Contractor Operator Agreement. (Filing 66-2, Tisinger Depo. 42:14-43:17; Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C; Ex. A to Tisinger Dec. at WRN-Midgett 00000449-00000450, 00000452; Ex. 9 to Plf. Depo., Plf. Second Agreement at WRN-Midgett 00007609, 00007611, 00007616-00007620). Owner operators choose different optional services and programs, such as health and vision insurance, and may have different deductions, or no deduction at all, for the purchase price of their trucks. (See generally Plf. First Agreement at Addendum C; Filing 66-2, Tisinger Depo. 42:14-43:17; Tisinger Dec. at ¶18 and Ex. A, WRN-Midgett 00000449-00000450).

Plaintiff's May 5, 2015 pay statement reflects deductions for the specific services Plaintiff requested, including:

- A $124 deduction for a personal advance, which Plaintiff requested because he "need[ed] money to buy stuff." (Ex. 6 to Plf. Depo. at WRN-Midgett 00000635 ("May 2015 Pay Statement"); Plf. Depo. 82:21-83:5; Plf. First Agreement, §§ 13-14).

- A $60 deduction for accounting fee because he requested that Larsen do his taxes and a deduction of $200 for his estimated taxes as indicated by Larsen. (May 2015 Pay Statement; Plf. Depo. 83:6-9, 83:20-84:3; Filing 66-2, Tisinger Depo. 45:3-10).

- A $15.33 deduction for the cost of diesel emission fluid Plaintiff purchased during the week, and a $872.40 deduction for fuel. (May 2015 Pay Statement; Plf. Depo. 67:21-25, 83:10-18, 84:4-6, 92:5-17; Plf. First Agreement at § 13-14 and Addendum C at § 1).

- A garnishment of $62.19 for child support. (May 2015 Pay Statement; Plf. Depo. 84:11-15).

- A $222.12 deduction for Plaintiff's maintenance escrow account. (May 2015 Pay Statement; Plf. Depo. 85:7-23; Plf. First Agreement, § 26.2).

- A truck payment deduction of $316.18 and a per-mile truck payment deduction of $219.14, both of which were applied toward the outstanding balance on Plaintiff's

truck. (May 2015 Pay Statement; Plf. Depo. 85:24-86:4, 86:13-87:5; Ex. 3 to Plf. Depo., Truck Purchase Agreement).

- An $11 deduction for federal highway use taxes, which Plaintiff "pay[s] to use the roads." (May 2015 Pay Statement; Plf. Depo. 86:8-12; Plf. First Agreement, § 17).

After deducting these expenses, Plaintiff received **net pay of $2,253.27 that week**. (May 2015 Pay Statement). During that pay period, Plaintiff drove 3,621 long-haul miles and 81 deadhead miles. (Id.).

On his December 11, 2018 pay statement, Plaintiff again had deductions for advances, diesel emission fluid, fuel, garnishment, his maintenance escrow account, and federal highway use tax. (Ex. 6 to Plf. Depo. at WRN-Midgett 00000508 ("December 2018 Pay Statement")). He also had a $35 deduction for bobtail insurance, a $25 deduction for the Qualcomm in-cab device, and a $296.70 deduction for truck insurance. (December 2018 Pay Statement; Plf. First Agreement at §§ 16, 24, 25, 29 and Addendum C-1 at §§ 3, 4). Because he had paid off his truck by this time, Plaintiff did not have any deductions for truck payments. After deducting expenses, Plaintiff received **net pay of $1,921.68 that week**. (December 2018 Pay Statement). During that pay period, Plaintiff drove 2,832 long-haul miles and 342 deadhead miles. (Id.).

Certain owner operators, just like any other small business owner, may experience weeks where their deductions exceed the amount of their net pay. (Filing 66-2, Tisinger Depo. 68:12-16). That is due to the amount and timing of certain expenses and deductions. (Id.; see also id. at 69:1-11). Although Plaintiff incorrectly claims this was a "regular" occurrence, Werner's Senior Director of Accounting Administration testified this varies by owner operator and some drivers **never** have negative revenue. (Filing 66-2, Tisinger Depo. 67:11-14; Plaintiff's Brief, Filing No. 65, p. 4; see also Jackson Dec. ¶10).

Plaintiff is absolutely wrong when he argues Werner admitted owner operators are not paid minimum wage and the testimony to which he cites does not even mention "minimum wage." (Compare Plaintiff's Brief at 4 with Filing 66-2, Tisinger Depo. at 67:10-23, 69:1-11). Because owner operators have assumed the risk of going into business for themselves, their net pay may vary from week to week. (See Filing 66-2, Tisinger Depo. 68:12-16, 69:9-11).

14

### C.      Plaintiff's Claims

Plaintiff filed this lawsuit in May, 2018, alleging that he and other owner operators should have been classified as employees because, according to Plaintiff, there is no difference between how Werner treats owner operators and company drivers. Plaintiff seeks to represent a class of owner operators who purchased or leased a truck from Werner, although he has never leased a truck from Werner. (Tisinger Dec. ¶12).

Although Plaintiff claims he did not make minimum wage while working for Werner and should have been classified as a company driver, he remained an owner operator for over a year after filing this lawsuit. (Tisinger Dec. ¶14). He also declined Werner's offer in June, 2019 to become a company driver. (Tisinger Dec. ¶15). Plaintiff even signed a new Contractor Operating Agreement with Werner in March, 2019, despite having filed this lawsuit in May, 2018. (Ex. 9 to Plf. Depo., Plf. Second Agreement).

Plaintiff admits he has not talked to any other Werner owner operators about his lawsuit and, to date, no other driver has opted in to this case. (Plf. Depo. 135:18-20). The only owner operators with whom Plaintiff has spoken told him they made *more* money as owner operators than as company drivers. (Plf. Depo. 136:11-19). Plaintiff has also made no effort to talk to any other owner operators about the case because it is "not [his] job" to worry about other owner operators. Specifically, Plaintiff testified as follows:

Q.    Have you talked to any other owner-operators about the lawsuit you filed?
A.    No.
Q.    Have you talked to any other owner operators - Werner owner operators who drive for Werner about whether they have the same complaints as you do[?]
A.    No.
Q.    **So you don't know if other owner operators want to continue as owner operators or want to be employees?**
A.    **I don't know about other owner operators. I only know about myself.**
Q.    You did mention to me earlier that you talked to some owner operators - some Werner owner operators - owner operators who drive for Werner before you became an owner operator.
A.    Yes. That was years ago.
Q.    Years ago. And they told you they made more money as owner operators than as company drivers, right?
A.    Yes.
*        *        *        *

> Q.   Have you thought about the relief you wanted? What did you want to happen?
>
> A.   Trying to make things better for owner operators.
>
> Q.   Well, you haven't talked to any other owner operators, right?
>
> A.   I don't - I don't - **it's not my job to go around and talk to other owner operators.**

(Plf. Depo. 136:4-19; 138:9-18) (emphasis added).

Plaintiff incorrectly claims Werner did not produce any evidence about the existence of complaints from other owner operators. (Plaintiff's Brief, Filing No. 65, p. 2). To the contrary, Werner's Senior Director of Accounting Administration testified that if a driver has a complaint about his or her compensation, the driver is instructed to direct the complaint to Werner's Director of Internal Audit via telephone, email or mail. (Filing 66-2, Tisinger Depo. 112:12-113:3). Werner confirmed during discovery that Werner's Director of Internal Audit has not received a complaint from an owner operator about compensation during the last five years. (Tisinger Dec. at ¶21 and Ex. D, Defendant's Supplemental Response to Plaintiff's First Set of Request for Production of Documents, p. 2; McGill Dec. ¶3).

Not only has Plaintiff failed to identify a single other owner operator who shares his alleged concerns, but as of the date he was deposed in June, 2019, Plaintiff also did not know what relief he was seeking on behalf of himself and the putative class and he did not "have any thoughts" on that issue. (Plf. Depo. 137:5-138:4).

## III.   Argument

### A.   Legal Standards for Class and Collective Certification.

Rule 23 of the Federal Rules of Civil Procedure governs whether a case is suitable for class certification. Bouaphakeo v. Tyson Foods, Inc., 765 F.3d 791, 802 (8th Cir. 2014) (quotation omitted). Class certification is only appropriate where:

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1428 (2013). Plaintiff's motion for class certification cannot be granted unless he establishes all Rule 23(a) requirements and shows this case falls within at least one Rule 23(b) category. Blades v. Monsanto Co., 400 F.3d 562, 568-69 (8th Cir. 2005).

Under Rule 23(b)(3), relied on by Plaintiff here, a class should only be certified if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [the Court concludes] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b); Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010). The main predominance inquiry is "whether the defendant's liability to all plaintiffs may be established with common evidence." Id.; see also, e.g., Blades, 400 F.3d at 566. Class certification is inappropriate if, "to make a prima facie showing on a given question, the members of the proposed class will need to present evidence that varies from member to member." Avritt, 615 F.3d at 1029. The Court must undertake a rigorous analysis of what the plaintiff will be required to prove and whether the claim can be proven with representative evidence. Id.

A plaintiff seeking to conditionally certify a collective action under § 216(b) of the Fair Labor Standards Act ("FLSA") must come forward with evidence to establish that he and "potential [class members] together were victims of a common policy or plan that violated the law." Garrison v. ConAgra Packaged Food, LLC, No. 4:12-cv-00737, 2013 WL 1247649, *2 (D. Ark. March 27, 2013). The basic issue is whether Plaintiff has shown there are "meaningful identifiable facts or legal nexus binding the claims, so that hearing the cases together furthers the purposes of § 216, is fair to both parties, and does not result in an unmanageable trial." Lopez v. Tyson Foods, No. 06-459, 2008 WL 3485289, *8 (D. Neb. Aug. 7, 2008).

In addition to showing that he and other drivers are similarly situated, a plaintiff seeking conditional certification must show other putative class members want to be part of the lawsuit and certification is appropriately denied when the plaintiff fails to make that showing. Parker v. Rowland Express Inc., 492 F. Supp. 2d 1159, 1164-65 (D. Minn. 2007); Martinez v. Cargill Meat Solutions, 265 F.R.D. 490, 496 (D. Neb. 2009); Knutson v. Blue Cross & Blue Shield of Minn., Civ. No. 08-584, 2008 WL 4371382, *3

(D. Minn. Sept. 23, 2008). Courts have also denied conditional certification where the claims at issue turn on evidence unique to each putative class member. See, e.g., Purdham v. Fairfax County Public Sch., 629 F.Supp.2d 544 (E.D. Va. 2009) (denying certification because class members were paid different amounts and in different manners, so liability and damages would turn on an individualized analysis); West v. Border Foods, Inc., No. 05-2525, 2006 WL 1892527, *6-10 (D. Minn. July 10, 2006) (quotation omitted) (denying conditional certification where the alleged violations occurred "on a manager-by-manager basis and associate-by-associate basis involving particular circumstances and anecdotal testimony"); Diaz v. Elec. Boutique, No. 04-0840, 2005 WL 2654270, *5 (W.D.N.Y. Oct. 17, 2005) (noting employees are not similarly situated if each claimant's claim turns on evidence unique to that individual); Holt v. Rite Aid Corp., 333 F.Supp.2d 1265, 1271 (M.D. Ala. 2004) (denying conditional certification because the court would have to inquire into the daily tasks performed by each class member to rule on liability).

      **B.**    **Plaintiff's Motion for Class and Conditional Certification should be denied because his claims cannot be proven with common proof, individual issues will predominate regarding each driver's relationship with Werner and the deductions that driver authorized, and Plaintiff is not an adequate class representative.**

Under Eighth Circuit law, "whether a given individual is an employee or an independent contractor is a question of law, which must be decided by reviewing the ***particular facts of each case***." Berger Transfer & Storage v. Cent. States Pension Fund, 85 F.3d 1374, 1378 (8th Cir. 1996) (emphasis added) (quoting Short v. Central States, Southeast & Southwest Areas Pension Fund, 729 F.2d 567, 571 (8th Cir. 1984)). The Eighth Circuit has relied on the following factors, referred to as the "economic realities" test, to determine whether a worker is properly classified as an employee or an independent contractor:

- The degree of control exercised by the alleged employer;

- The worker's investment in the business;

- The degree to which the worker's opportunity for profit and loss is determined by the alleged employer;

- The skill and initiative in performing the job;

- The permanency of the relationship; and

- The extent to which the work is an integral part of the alleged employer's business.

Karlson v. Action Process Serv. & Private Investigation, LLC, 860 F.3d 1089, 1092 (8th Cir. 2017); see also, e.g., Berger, 85 F.3d at 1378 (referencing similar factors as the "common law" test for deciding whether a worker is an employee or an independent contractor) (citing Darden, 503 U.S. at 323-24); Harris v. Express Courier, Int'l Inc., 2017 U.S. Dist. LEXIS, 192363, *17 (W.D. Ark. Nov. 21, 2017). In analyzing that issue, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Berger, 85 F.3d at 1378 (quotation omitted). The factfinder must examine "the precise nature of [the worker's] duties and relationship with the alleged employer." Karlson, 860 F.3d at 1092.

Inexplicably, Plaintiff ignores that governing Eighth Circuit precedent and relies primarily on out-of-circuit cases. (See, e.g., Plaintiff's Brief, pp. 10, 12, 14, 16-17). However, the economic realities test is highly relevant to Plaintiff's Motion for Class and Conditional Certification because, in ruling on a motion to certify, this Court should consider the substantive elements of the claims at issue, the evidence required to establish those elements, and whether the claims of all drivers can be proven with representative evidence. Avritt, 615 F.3d at 1029. In other words, in ruling on the instant motion, "the Court's task is simply to consider whether the economic realities inquiry may be performed by the fact-finder on a classwide basis." Harris, 2017 U.S. Dist. LEXIS, 192363, *17 (decertifying a class of delivery drivers claiming they were misclassified as independent contractors, because the factors relevant to the economic realities of the parties' relationship had to be evaluated individually for each driver). Because the evidence in this case makes clear that Plaintiff and putative class members had different experiences while driving for Werner, "it will be inefficient, if not impossible, to attempt to try all the [putative] class members' claims at once[.]" Id.

Not only do the factors relevant to whether owner operators were properly classified require individualized proof, but in order to establish liability, Plaintiff "would also have to prove that the [drivers in the putative class] were not paid an appropriate weekly minimum wage." Harris, 2017 U.S. Dist. LEXIS 192363, *27. Specifically, to

succeed on an FLSA claim for failure to pay minimum wage, Plaintiff must prove (1) he performed compensable work and (2) the number of hours for which he has not been properly paid. Hertz v. Woodbury Cty., 566 F.3d 775, 783 (8th Cir. 2009). Because Plaintiff claims deductions improperly reduced his pay below minimum wage, the factfinder could not resolve Plaintiff's claim, or those of the putative class, without considering, for each deduction taken from each driver's pay each week, the nature of the deduction at issue and whether the driver had use of the money for a purpose of his own choosing. See, e.g., Vazquez v. Tri-State Mgmt. Co., Case No. 01 C 5926, 2002 U.S. Dist. LEXIS 385 (N.D. Ill. Jan. 10, 2002) (deduction for payment to third party was permissible, even where it reduced wages below minimum wage, because the employee had the use of that money for a purpose of his own choosing); Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362 (5th Cir. 1973); Adamson v. W.R. Coleman Excavation, Ltd. Liab. Co., No. 2:16-CV-00092, 2017 U.S. Dist. LEXIS 153357 (D. Utah Sep. 19, 2017). The question of "*whether* [putative class members] are owed anything due to a failure [to properly classify them] is a liability question that cannot be set aside" until some later date. Harris, 2017 U.S. Dist. LEXIS 192363, *27. Because that issue cannot be resolved classwide, Plaintiff's claims cannot be certified.

> **1.   Plaintiff's claims are not typical or common and individual issues will predominate because drivers had different experiences while working as owner operators for Werner, so the economic realities test will turn on evidence specific to each driver.**
>
> > **a.   The evidence regarding Werner's control over Plaintiff and putative class members' work is individualized.**
> >
> > > **i)   Plaintiff's testimony regarding the control Werner exerted differs from the testimony of other owner operators and the terms of his Contractor Agreements.**

One key factor in deciding whether Plaintiff and putative class members were properly classified as independent contractors is Werner's alleged right to control the manner and means by which they completed their work. See, e.g., Karlson, 860 F.3d at 1092; Harris, 2017 U.S. Dist. LEXIS 192363, *11. However, Plaintiff's testimony regarding Werner's alleged control over his work as an owner operator differs markedly

from the experiences of other owner operators and frequently conflicts with the terms of his Contractor Operating Agreements and other documents he signed. For example, the Agreement states that owner operators may select where and how to perform truck maintenance and repairs, including at Werner shops, independent repair shops, or by doing the maintenance themselves. (Ex. 1 to Plf. Depo., Plf. First Agreement, at § 2, 10(B) and Addendum C at §§ 1, 2). Consistent with the Agreement, Werner's Senior Vice President of Van and Expedited Operations testified that many owner operators perform their own truck maintenance or choose to have repairs done at non-Werner shops. (Filing 66-3, Dittberner Depo. 103:1-9). However, Plaintiff claimed he "had to" take his truck to the Werner shop for maintenance when he was an owner operator, because he could not afford to go elsewhere. (Plf. Depo. 56:24-57:12).

Plaintiff and other owner operators also gave conflicting accounts regarding Werner's right to control the speed at which they drove their vehicles. Although Plaintiff signed an Acknowledgment Form stating he could remove the governor on his truck, he apparently did not understand that form and testified he did not have the authority to remove the governor and "you can get fired" for doing so. (Compare Plf. Depo. 58:9-16, 59:16-60:6 with Ex. 2 to Plf. Depo.). By contrast, Brayman removed the governor from his truck so he could drive faster and cover more miles in a shorter period of time. (Brayman Dec. ¶16).

Plaintiff's Contractor Operating Agreement also states that the cost of premiums for such things as bobtail insurance and worker's compensation insurance would be deducted from Plaintiff's pay as an owner operator "**if elected by CONTRACTOR**." (Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C, § 4). However, Plaintiff testified Werner "didn't give me the option" of purchasing insurance elsewhere, stating "they provide it, I paid for it." (Plf. Depo. 53:4-19). Plaintiff did not understand he could have obtained that insurance elsewhere. (Id. at 54:2-6). By contrast, other owner operators did understand they had that option and chose to obtain that insurance elsewhere. (Filing 66-2, Tisinger Depo. 43:7-10; 42:17-21).

Because Plaintiff and other owner operators provide differing accounts regarding the extent of the control Werner exerted over their businesses, "the evidence necessary to establish actual control … is individualized" and will "overwhelm[] [any] common

evidence." <u>Casias v. Distrib. Mgmt. Corp.</u>, Case No. 11-00874, 2014 U.S. Dist. Corp., 197250, *51 (D. N.M. March 31, 2014).   Plaintiff incorrectly argues his claims and those of the putative class can be determined solely by reviewing the Contractor Operator Agreement and Owner Operator Handbook. (Plaintiff's Brief, pp. 5-8). To the contrary, it is not possible to determine whether *any* driver should be classified as an employee simply by looking at the Agreement or Handbook because Eighth Circuit case law makes clear that "all of the incidents of the relationship must be assessed and weighed." <u>Schwieger v. Farm Bureau Ins. Co.</u>, 207 F.3d 480, 483 (8th Cir. 2000) (citation omitted). In other words, "common contractual evidence [if any] constitutes only a single factor under the economic realities test and does not describe the 'total employment situation' of a putative class member." <u>Casias v. Distrib. Mgmt. Corp.</u>, Case No. 11-00874, 2014 U.S. Dist. LEXIS 197250, *51 (D. N.M. March 31, 2014).

Plaintiff's argument also fails because Plaintiff frequently testified that he was required to do things which the Contractor Operating Agreement indicates are optional or he could not do things that other documents he signed indicated he could do (such as removing the governor from his truck). (<u>Compare</u> Plf. Depo. 53:7-22 <u>with</u> Plf. First Agreement at Addendum C at § 4 (option to obtain insurance); <u>compare</u> Plf. Depo. 56:24-57:12 <u>with</u> Plf. First Agreement at Addendum C at § 2 (option to conduct maintenance at non-Werner shops); <u>compare</u> Plf. Depo. 58:13-19 <u>with</u> Ex. 2 to Plf. Depo. (option to remove governor)). Misclassification claims cannot be certified when the plaintiff "attempt[s] to show that Defendant in actuality exercised the control that the contracts grant to [plaintiff]." <u>Casias</u>, 2014 U.S. Dist. LEXIS 197250, *51. In such cases, "the merits of the [plaintiff's] claims turn on their day-to-day work and not upon any company-wide contractual policies." <u>Id.</u> at *52 (denying motion to certify class of drivers partially because the evidence required to prove plaintiffs' claims would be highly individualized because drivers reporting varying levels of control and claimed they could not do things their contract indicated they could do). Because Plaintiff frequently argued he had no choice with respect to decisions the Contractor Operating Agreement and Addenda indicate were his to make, "the Court must examine the individual circumstances of each putative class member and determine how each class member, in actuality, interacted with [Werner] on the question of control[.]" <u>Id.</u> at *51.

Not only do Plaintiff and other owner operators present differing accounts of the level of control Werner exercised over their businesses, but there have been numerous versions of the Contractor Operating Agreement and Addenda in effect during the class period, with different terms and requirements. (Plf. First Agreement; Plf. Second Agreement; Ex. B and C to Tisinger Dec.). For example, the Agreement Plaintiff signed in 2015 did not include any requirement that drivers save money in an escrow fund, whereas the Agreement Plaintiff signed in March, 2019 required any driver operating a truck purchased from Werner and not fully paid off to deposit a certain amount of money into an escrow account for potential repairs. (Compare Plf. First Agreement at § 26.2 with Plf. Second Agreement at §§ 26.2, 26.3). The latest version of the Contractor Agreement contains other changes, such as authorizing owner operators to drive for other companies under certain circumstances. (Ex. B to Tisinger Dec. at § 3). There have also been 11 versions of the Owner Operator Handbook in effect during the class period, with differing terms and requirements. (Tisinger Dec. at ¶20). As a result, Plaintiff's' and putative class members' work for Werner was not governed by uniformly applicable standards, further complicating any classwide analysis into the degree of control Werner exerted over their work. The individual inquiries required simply to determine the policies governing each driver's relationship with Werner, from the various handbooks, Agreements, and Addenda in effect during the class period, preclude class certification. Marion v. Werner Enters., No. 8:08CV466, 2009 U.S. Dist. LEXIS 101706, at *24 (D. Neb. Sep. 9, 2009) (declining to certify plaintiff truck drivers' claims partially because there was undisputed evidence that different driver handbooks were in effect at different points in the class period, so plaintiffs could not prove all drivers' claims were governed by the same terms). In light of these factual variances, the factfinder cannot make a classwide determination regarding Werner's right to control Plaintiff and putative class members. See, e.g., Harris, 2017 U.S. Dist. LEXIS 192363, *21 (concluding couriers' misclassification claims could not be resolved classwide because their conflicting accounts of how they were treated "varied so greatly).

       **ii)**    **The fact that all Werner owner operators, like all other interstate commercial truck drivers, are subject to federal safety regulations does not eliminate the need to consider individualized evidence regarding the level of control Werner exerted over each owner operator.**

Plaintiff weakly argues certain "Werner policies" provide classwide evidence of control. (Plaintiff's Brief, pp. 5-8). However, the vast majority of the "policies" to which Plaintiff cites, and which he incorrectly argues were "established by Werner," are actually safety regulations promulgated by the Federal Motor Carrier Safety Administration ("FMCSA"). Those regulations are applicable to **all** interstate commercial drivers, including Werner company drivers, Werner owner operators, and all other commercial truck drivers. See 49 C.F.R. §§ 390.3T(e), 395.1, 396.1. Because those safety requirements are mandatory for all interstate truck drivers, those requirements "are not highly probative of control and thus not particularly relevant to" to the issue of whether drivers are "similarly situated" for purposes of evaluating their appropriate classification as employees or independent contractors. Garcia v. Vasilia, No. H-17-1601, 2019 U.S. Dist. LEXIS 130687, *19-20 (S.D. Tex. Aug. 5, 2019); see also Berger, 85 F.3d 1374. Specifically, at least 18 of the 28 "rules and regulations" which Plaintiff falsely claims were "established by Werner" are actually FMCSA safety regulations applicable to all interstate commercial drivers, including:

- The requirement that owner operators drive exclusively for Werner. See 49 C.F.R. § 376.12(c) ("The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease.").

- The requirement that drivers must perform a daily inspection of the truck prior to beginning a trip and send the report to Werner. 49 C.F.R. §§ 396.11, 396.13 (inspection and reporting requirements).

- The requirement that drivers maintain specific technology on their trucks and keep trucks clean and businesslike. 49 C.F.R. §§ 395.20, 395.22, 395.24 (electronic logging device ("ELD") technology requirements).

- The requirement that drivers have Werner logos and signs on their trucks. 49 C.F.R. §§ 376.11(c); 390.21T (marking requirements).

- The requirement that in-cab devices use navigation software which records data regarding the location of the truck. 49 C.F.R. §§395.8(c) (requiring duty status changes to record the name of the nearest city, town or village and state), 395.26(b) (requiring ELD to periodically record geographic data)).

- The requirement that trucks be no more than five (5) years old at the time of purchase. See, e.g., 49 C.F.R. § 390.11 and 49 C.F.R. Part 393 (minimum standards for commercial motor vehicles).

- The requirement that drivers refrain from using radar detection devices. 49 C.F.R. § 392.71 (prohibiting use of radar detection devices).

- The requirement that trucks pass inspections. 49 C.F.R. § 396.3 (requiring systematic inspection, repair, and maintenance); 49 C.F.R. Part 393 (minimum standards for commercial motor vehicles).

- The requirement that drivers must operate under Werner's DOT number and have that number affixed to their truck. 49 U.S.C. 14102(a)(4); 49 C.F.R. § 376.11(c), 390.21T (marking requirements).

- The requirement that drivers have electronic logging devices in their trucks at all times. 49 U.S.C. 31137; 49 C.F.R. § 395.20, 395.22, 395.24.

- The requirement that drivers keep their driving logs current and accurate. 49 C.F.R. § 395.8(e)(1), (f)(1).

- The requirement that drivers log when they purchase fuel, complete pre-trip inspections, and change their duty status. See 49 C.F.R. § 395.24 (logging duty statuses and annotations).

- The requirement that drivers are subject to corrective action if they do not properly log hours of service. See 49 C.F.R. § 395.8(f)(7) (drivers must certify logs are correct); 395.13 (drivers may be declared out of service for violations); 395.3 (setting maximum hour limits).

- The requirement that drivers must obtain permits to have a guest ride in their truck. 49 C.F.R. § 392.60(a) (requiring written authorization from the motor carrier).

- The requirement that trucks are subject to search by Werner. 49 C.F.R. § 390.11 (duty to require drivers and equipment be in compliance with regulations).

- The requirement that drivers must report tickets and citations. 49 C.F.R. § 383.31 (notification of convictions for driver violations).

- The requirement that drivers submit commercial vehicle inspection reports to Werner. 49 C.F.R. § 396.3 (requiring inspection, repair, and maintenance),

25

396.17 (requiring periodic inspections), 396.21 (requiring motor carriers to keep records of inspections).

- The requirement that drivers report any motor vehicle accidents to Werner. 49 C.F.R. § 390.15 (requiring motor carriers to maintain an accident register).

(<u>See</u> Plaintiff's Brief, pp. 5-8).

Because all interstate commercial truck drivers are required to comply with those FMCSA regulations, Plaintiff's argument that those regulations qualify as classwide evidence of Werner's control over owner operators fails. The Eighth Circuit has confirmed that the mere fact that all drivers are subject to a uniform federal regulation does not alleviate the need to examine the realities of each driver's experience with the carrier in deciding the carrier's level of control over the driver's work. <u>See Berger</u>, 85 F.3d 1374 (concluding that although all drivers were subject a federal regulation governing when they could drive for another carrier, it was necessary to examine each driver's actual experience). Other courts have similarly rejected the argument that a plaintiff can prove a carrier had sufficient control over drivers so as to render them employees solely through evidence they had to comply with federal laws applicable to all commercial truck drivers. <u>Garcia</u>, 2019 U.S. Dist. LEXIS 130687, *19-20 (noting safety requirements are not "probative" of control because they are mandated by the federal government, so the fact that all putative class members are subject to those requirements is not classwide evidence of control by the carrier); <u>see</u> <u>also</u> <u>Casias</u>, 2014 U.S. Dist. LEXIS 197250 (the classification inquiry "requires examination into each potential plaintiff's employment situation, because the economic realities inquiry specifically examines the *factual reality* of the worker.") (emphasis in original).

Plaintiff is also incorrect when he argues the DOT considers independent contractors to be employees. (Plaintiff's Brief, p. 3). Federal regulations mandate that a motor carrier must require **all** drivers who operate under the motor carrier's DOT authority to comply with the FMCSA safety regulations. 49 C.F.R. § 390.11. (Filing 66-1, Deposition of Jaime Maus ("Maus Depo.") 43:10-16, 114:8-114:13). Because the FMCSA safety regulations apply equally to employee drivers and independent contractors who drive for motor carrier, those regulations define the term "employee"

more broadly than the common law definition, so as to encompass <u>any</u> driver that could potentially be hauling a load for a motor carrier. <u>See</u> 49 C.F.R. § 390.5.

Plaintiff's argument that owner operators must be considered employees any time a motor carrier (such as Werner) requires them to comply with federal safety regulations is also inconsistent with other federal DOT regulations. Federal regulations expressly permit motor carriers to engage owner operators as independent contractors. 49 C.F.R. § 376.12(c)(4) ("***An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements***."). Because all commercial drivers must comply with the FMCSA safety regulations, Plaintiffs' theory that drivers who comply with such regulations are necessarily employees would mean that no owner operator could ever be considered an independent contractor. Taken to its logical extension, Plaintiff's argument would render meaningless the FMCSA regulations expressly permitting motor carriers to hire independent contractor drivers. This Court should not apply the FSLA regulations in a way that would render the FMCSA regulations meaningless. <u>See</u>, <u>e.g.</u>, <u>Solis v. Summit Contractors, Inc.</u>, 558 F.3d 815, 823-24 (8th Cir. 2009) (noting courts should avoid legal interpretations that would render other regulatory language meaningless).

          **iii)    Plaintiff's only other alleged evidence of control is inadequate, irrelevant, and sometimes misstated.**

Other than federally-mandated FMCSA safety regulations, Plaintiff cites only a handful of alleged "policies" as classwide evidence of Werner's control over drivers. However, Plaintiff misstates certain evidence and, in any event, those alleged "policies" do not amount to classwide evidence of Werner's control over the manner and means by which owner operators completed their work. For example, Plaintiff argues owner operators are required to communicate with Werner about the status of their trips, must deliver loads on time, and may be disciplined for late loads. (Plaintiff's Brief, p. 15). However, Plaintiff admitted "it's ultimately the customer that decides when they want the load delivered" and "it makes good sense, as a driver, as an individual, and Werner or any trucking company as a company to provide timely pick up and drop off if that's what the customer wants[.]" (Plf. Depo. 100:9-11; 186:3-14). Accordingly, the fact that Plaintiff and other owner operators communicated with Werner as to the status of their loads

and had to deliver loads on time does not show Werner's control over the method and means by which they completed their work. Those requirements are simply a basic part of being engaged in the hauling and delivery of freight for customers.

Plaintiff also incorrectly argues owner operators' "calls with Werner are subject to monitoring and recording by Werner." (Plaintiff's Brief, p. 15). Plaintiff misstates the testimony of Werner's Director of Safety, Jaime Maus. As Ms. Maus explained, Werner occasionally monitors calls by "our associates at headquarters" to "make sure we're staffed accordingly and our people are treating people on the other line with respect." (Filing 66-1, Maus Depo. 105:13-106:21). Contrary to Plaintiff's argument, Ms. Maus specifically testified "***it's not being recorded***" but "I could log in and listen to [an associate at headquarters] … to make sure he's accurate and helpful and respectful." (Id. at 106:6-10) (emphasis added). In other words, the phone policy is no different than "you calling Cox Communications" and hearing a disclaimer that the call may be monitored to ensure appropriate customer service. (Id. at 106:11-21).

Bizarrely, Plaintiff also relies on a policy prohibiting drivers from recording work-related phone calls, meetings or other company activities without permission from Werner. (Plaintiff's Brief, p. 17). However, evidence of alleged "control is only significant when it shows … control over a meaningful part of the business[.]" Garcia, 2019 U.S. Dist. LEXIS 130687, *13 (quotation omitted). Plaintiff does not explain how a policy prohibiting drivers from recording certain conversations demonstrates Werner's control over how they performed their jobs of hauling and delivering freight for customers.

Plaintiff also weakly argues the fact that owner operators have to give advance notice if they plan to have pets in their trucks is classwide evidence of control. However, as Werner's Director of Safety explained, that policy exists because "certain breeds are not allowed in Canada," so "we just need to know the breed just so that we don't send them to Canada by accident." (Filing 66-1, Maus Depo. 110:5-19). Moreover, Plaintiff again fails to explain how the pet policy demonstrates Werner's "control over a meaningful part" of owner operators' business of hauling and delivering freight. Garcia, 2019 U.S. Dist. LEXIS 130687, *13 (quotation omitted).

Plaintiff also cites the fact that owner operators are required to carry various forms of insurance, such as worker's compensation insurance and bobtail insurance.

(Plaintiff's Brief, p. 15). However, the requirement for worker's compensation insurance is in place because Werner could be liable for damages flowing from an owner operator's failure to procure workers' compensation coverage under Nebraska law. Neb. Rev. Stat. § 48-119; Rogers v. Hansen, 211 Neb. 132, 136, 317 N.W.2d 905, 908 (1982) (internal citations); see also Neb. Rev. Stat. § 48-115. Similarly, the requirement for bobtail insurance is in place because Werner's liability coverage only applies if the driver is operating under a load (See Tisinger Depo. 107:22-108:11). Accordingly, owner operators would otherwise be uninsured if they got involved in accidents while not under a load, which is contrary to state minimum financial responsibility laws. See, e.g., Neb. Rev. Stat. § 60-387 (requiring an application for registration of a motor vehicle be accompanied by proof of financial responsibility or evidence of insurance covering the motor vehicle).

Plaintiff also argues control can be shown by the fact that owner operators are required to use specific navigation software allowing Werner to "view trucks" and "monitor truck locations." (Plaintiff's Brief, p. 14). However, as noted above, the FMCSA safety regulations require that commercial trucks must be equipped with navigation software capable of identifying the general location of the truck. 49 C.F.R. §§395.8(c). Moreover, Plaintiffs again misstate the testimony of Werner's Director of Safety, Jaime Maus. As Ms. Maus explained, Werner is only able to generally identify where a truck is located - i.e., within about a 10 mile radius. (Filing 66-1, Maus Depo. 25:8-23). When an owner operator is not under a load for a customer, Werner does not track the location of his or her truck. (Id.). Plaintiff has not identified any classwide evidence suggesting Werner actually monitored his location on a regular basis or the locations of other owner operators, because no such evidence exists and, in any event, that showing could not be made on a classwide basis. In the absence of such evidence, Plaintiff's argument regarding Werner's alleged ability to monitor the location of trucks is irrelevant. "[T]he actual control a putative employer exerts over its workers is far more important in the misclassification analysis than the employer's right to control." Harris, 2017 U.S. Dist. LEXIS 192363, *16 (citing numerous cases).

        **b.**      **The degree, if any, to which owner operators'**
                **opportunity for profit and loss is determined by Werner**
                **cannot be proven with common evidence and drivers**
                **invest differing amounts in their business.**

There is also conflicting and individualized evidence regarding the degree, if any, to which owner operators' profit and loss was controlled by Werner and the extent of their investment in their business, two other important factors in the economic realities analysis. See, e.g., Karlson, 860 F.3d at 1092; Harris, 2017 U.S. Dist. LEXIS 192363, *20-21. Although Plaintiff claims he sometimes made less than minimum wage as an owner operator (after deducting expenses), Werner's Senior Director of Accounting Administration testified that certain other owner operators ***never*** have negative revenue. (Filing 66-2, Tisinger Depo. 67:11-14). Consistent with that testimony, the only other Werner owner operators with whom Plaintiff has spoken told him they make more money as owner operators than as company drivers. (Plf. Depo. 136:4-19; 138:9-18) (emphasis added). The owner operators identified by Werner have similarly confirmed they make more money as owner operators, it is possible to be profitable as an owner operator if you work hard and make good decisions, and they do not wish to go back to being employees / company drivers. (Brayman Dec. ¶¶13, 14, 22, 23; Tew Dec. ¶¶13, 20, 21; Jackson Dec. ¶¶10, 19, 20). As this evidence demonstrates, drivers' ability to make a profit and the extent of their investment in their business will necessarily depend, to some extent, on their individual work ethic and desire to succeed.

For example, Plaintiff placed a weight limit on the loads he would drive and refused to drive in certain areas of the country, which reflects a work ethic much different from those owner operators who did not restrict the loads they were willing to accept. (Filing 66-3, Dittberner Depo. 77:21-78:3). Plaintiff also chose not to take advantage of the driver trainer program, and the increased revenue he could have derived from teaming with a student driver. (Plf. Depo. 48:13-23). However, other owner operators worked as driver trainers and enjoyed increased profits as a result. (Brayman Dec. ¶15). Moreover, although Plaintiff claims he was unable to make a profit in Werner's owner operator program, the owner operators with whom he spoke before buying his truck informed Plaintiff they were making *more* money than company drivers. (Plf. Depo. 31:19-32:9). Similarly, the three owner operators disclosed by Werner have

all confirmed they make more money as owner operators and wish to continue in that role. (Brayman Dec. ¶¶13, 14, 22, 23; Tew Dec. ¶¶13, 20, 21; Jackson Dec. ¶¶10, 19, 20). Plaintiff and class members are not "similarly situated with respect to their opportunities for profit or loss" and "it would be necessary to perform individual inquiries … to determine whether their individual opportunities for profit or loss weighed in favor of employee or independent contractor status." Blair v. Transam Trucking, 309 F. Supp. 3d 977, 1007 (D. Kan. 2018) (decertifying misclassification claims brought by a class of truck drivers, noting the highly individualized evidence required to prove certain factors in the economic realities test, including opportunity for profit or loss).

Courts analyzing these factors in cases alleging misclassification of drivers have also considered the drivers' "varying levels of investment in their vehicles" and the impact of each driver's individual purchase arrangement on his ability to make a profit after deduction of expenses. See, e.g., Garcia, 2019 U.S. Dist. LEXIS 130687, *25. When Plaintiff bought his first truck from Werner, he had no money for a down payment and opted to finance the total purchase price. (Plf. Depo. 63:23-64:7; Ex. 3 to Plf. Depo., Purchase Order; Tisinger Dec. ¶9). As a result, Plaintiff had higher truck payments deducted from his pay than other drivers who put money down or received trade-in value. By contrast, when Plaintiff bought his second truck, he made a $2,000 down payment and got a trade-in credit of $11,000, resulting in lower truck payments. (Ex. 10 to Plf. Depo. at WRN-Midgett 00003003). Because he did not think about preventative maintenance before becoming an owner operator, Plaintiff also had to take out loans from Werner on several occasions to pay for repairs, while other owner operators planned for their maintenance and never took out loans. (Ex. 4 and 5 to Plf. Depo., WRN-Midgett 00000019-00000024; Tew Dec. ¶9; Jackson Dec. ¶7).

The only "evidence" Plaintiff cites relevant to these factors is that owner operators deliver freight for customers selected by Werner and do not arrange their own trips. (Plaintiff's Brief, p. 15). However, as other courts have concluded, the fact that a carrier supplies the driver with his assignments is not classwide evidence that the carrier controlled the driver's opportunity for profit and loss, when the drivers had various means for increasing the amount of revenue they made on each load, so "there were differences in the drivers' ability to profit." Garcia v. Vasilia, No. H-17-1601, 2019

U.S. Dist. LEXIS 130687 (S.D. Tex. Aug. 5, 2019); see also, e.g., Harris, 2017 U.S. Dist. LEXIS 192363; Casias, 2014 U.S. Dist. LEXIS 197250. Similarly, because Plaintiff and other owner operators "have all made differing levels of investment in their businesses, it would not be possible to perform a uniform analysis [regarding that factor of the economic realities test] on a classwide basis." Blair, 309 F. Supp. 3d at 1007 (decertifying misclassification claims brought by a class of truck drivers, due to the individualized nature of the evidence relevant to the economic realities test).

### c. Owner operators have different levels of skill and experience in running a small business.

Another factor relevant to the analysis of whether Plaintiff and putative class members were properly classified as independent contractors is the level of skill required. Berger, 85 F.3d at 1378. "[W]hile driving a truck could be considered 'simple,' … running a small business … is not quite as simple." Garcia, 2019 U.S. Dist. LEXIS 130687, *31. Where, as here, "the skills and initiative of the drivers varied," this factor will turn on individualized proof and class certification is inappropriate. Id. The variation in drivers' skills and initiative "weighs against collective consideration of their claims." Id.

Here, the evidence makes clear that Plaintiff and other owner operators had markedly different levels of skill and experience in running a small business. When Plaintiff became an owner operator, he had little knowledge about how to manage fuel and maintenance costs and far less experience managing his expenses and maintaining a truck than other owner operators, some of whom had already been driving for several years before Plaintiff even became an owner operator. (Tew Dec. ¶4; Plf. Depo. 93:18-21, 45:13-21, 64:16-19). For example, Plaintiff initially didn't do anything to manage his fuel prices because he didn't even think about fuel when he decided to become an owner operator. (Plf. Depo. 45:13-21). Plaintiff's testimony that he later tried to manage fuel expenses by "check[ing] fuel prices" is not typical because other drivers testified they started managing fuel expenses as soon as they became owner operators, by carefully planning trips, driving out of route to find cheaper fuel, monitoring their speed, purchasing more aerodynamic trucks, and fueling in states with cheaper fuel. (Plf. Depo. 94:2-9; Tew Dec. ¶¶4, 14; Jackson Dec. ¶¶4, 11).

Plaintiff selected his truck based on different criteria than other owner operators used in selecting their trucks. Plaintiff bought his truck from Werner because he liked the color and had driven that make and model before. (Plf. Depo. 60:24-61:7). Tew, on the other hand, selected an aerodynamic truck to improve fuel efficiency and Brayman had his truck inspected before purchasing it. (Tew Dec. ¶6; Brayman Dec. ¶6).

Plaintiff also had less experience than other owner operators in scheduling and keeping up with the preventative maintenance required to keep his truck in good working order. For example, Plaintiff only owned his first truck for four years before the "engine blew up." (Plf. Depo. 104:18-105:13; Ex. 3 and 10 to Plf. Depo.). In Brayman's and Tew's experience, however, trucks last 1,000,000 miles or more with regular maintenance and Tew has driven the same truck for 7 years. (Plf. Depo. 104:18-105:7; Brayman Dec. ¶6; Tew Dec. ¶6). Although Plaintiff argues, without evidence, that Werner classifies owner operators as independent contractors partially in an effort to "offload its aging fleet onto unsuspecting [drivers]," Plaintiff admitted he selected the truck he purchased from Werner and it had "low miles" for an over the road truck. (Plf. Depo. 61:4-17; 62:15-63:2). By alleging Werner "offload[ed] its aging fleet" onto unsuspecting owner operators, Plaintiff has put the age and condition of each putative class member's vehicle at issue. Moreover, other owner operators were pleased with the quality and condition of the trucks they purchased from Werner, suggesting Plaintiff's personal experience with his truck may have been dictated more by his lack of experience than by any conduct on Werner's part. (Brayman Dec. ¶5; Tew Dec. ¶¶5-6). In fact, contrary to Plaintiff's allegations, Brayman and Tew confirmed that it is not unusual for an owner operator to purchase more than one used truck from Werner during the course of his or her career, because Werner is known for taking exceptionally good care of its trucks. (Brayman Dec. ¶5; Tew Dec. ¶¶5-6). This factor in the economic realities test will similarly turn on individualized evidence and certification is inappropriate. Garcia, 2019 U.S. Dist. LEXIS 130687, *31.

### d. The remaining economic realities factors do not weigh in favor of class certification.

The two remaining factors courts consider in evaluating employee status under the FLSA similarly weigh against class certification here. One such factor is the

"permanency of the relationship" between the independent contractor and the alleged employer. <u>Harris</u>, 2017 U.S. Dist. LEXIS 192363, *11. Here, that factor requires individualized evidence because owner operators may work for Werner for varying amounts of time. For example, Jackson became an owner operator in 2018, Brayman has driven as an owner operator since 2015, and Tew has been an owner operator since 2007. <u>See, e.g.</u>, <u>Blair,</u> 309 F.Supp. 3d at 1007 (noting this factor was too individualized for class certification where drivers' tenure with the carrier varied). (Jackson Dec. ¶4; Brayman Dec. ¶4; Tew Dec. ¶4). Courts also consider "the extent to which the work is an integral part of the alleged employer's business." <u>Harris</u>, 2017 U.S. Dist. LEXIS 192363, *11. Although owner operators deliver loads for Werner's customers, that factor alone cannot be enough to tip the balance in favor of employee status because such a finding would invalidate the federal regulations authorizing motor carriers to hire independent contractor drivers. For the same reasons, that factor cannot, in and of itself, provide the type of classwide proof required for certification.

> **2.      Because Plaintiff's claims, and those of putative class members, require individual inquiries regarding the deductions authorized by each driver during each week in the class period, Plaintiff's claims are not typical or common and individual issues will predominate.**

Not only is the evidence relevant to certain factors in the economic realities test highly individualized but Plaintiff's claims also turn on individualized evidence regarding the deductions authorized by each driver. Establishing a minimum wage violation requires an individualized analysis of: (1) how many hours a driver worked in a week; (2) how much the driver was paid for those hours; (3) what deductions, if any, were made from the driver's pay; and (4) whether, for each deduction, the owner operator had use of the money for a purpose of his own choosing. <u>See</u>, <u>e.g.</u>, <u>Vazquez v. Tri-State Mgmt. Co.</u>, Case No. 01 C 5926, 2002 U.S. Dist. LEXIS 385 (N.D. Ill. Jan. 10, 2002) (deduction for payment to third party was permissible, even where it reduced an employee's wages below minimum wage, because the employee had the use of that money for a purpose of his own choosing); <u>Brennan v. Veterans Cleaning Serv., Inc.</u>, 482 F.2d 1362 (5th Cir. 1973); <u>Adamson v. W.R. Coleman Excavation, Ltd. Liab. Co.</u>, No. 2:16-CV-00092, 2017 U.S. Dist. LEXIS 153357 (D. Utah Sep. 19, 2017). Here,

establishing those elements necessarily requires proof of, and analysis into, the facts and circumstances surrounding each deduction taken from each driver's pay each week, including whether each deduction was authorized.

The deductions taken from Plaintiff's pay are based on the services he selected when he entered into his various Contractor Operating Agreements with Werner. Because other owner operators selected different services, they would have different deductions and proving Plaintiff's claims proves nothing for any other owner operator. For example, Plaintiff authorized deductions for the following:

- Payments on loans for truck repairs;
- Payments for his truck, in which he ultimately built $11,000 of equity;
- Cash advances;
- Purchases he made at the company store;
- Accounting services;
- Insurance;
- Fuel costs.

(Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C; Ex. 9 to Plf. Depo., Plf. Second Agreement at Addendum C, Maintenance Deduction Fund authorization and Settlement Deduction Authorization; Ex. A to Tisinger Dec.). The nature and extent of each deduction, and whether the driver authorized the deduction, must be individually analyzed to determine whether the owner operator had use of that money for a purpose of his or her own choosing as part of the minimum wage analysis. Plaintiff's claims are unique because he selected different options under the Contractor Operating Agreement and requested different deductions from his pay due to business decisions he made, such as decisions about the trucks he purchased, maintenance and repairs, fuel, cash advances, and other expenditures.

This analysis must be done for each driver each week to determine whether any driver made less than minimum wage. Because "the question of whether the drivers are owed anything due to a failure to comply with the minimum wage laws *is a liability question that cannot be set aside*" at the class certification stage, class certification is not appropriate. Harris, 2017 U.S. Dist. LEXIS 192363 *28 (emphasis added).

### 3.    There is no classwide methodology that can be used to determine damages.

Plaintiff's motion should also be denied because Plaintiff failed to propose any uniform method for computing damages on a class wide basis, a failure with dooms his request for class certification. Harris, 2017 U.S. Dist. LEXIS 192363, *26-28. Specifically, Plaintiff has not identified any classwide methodology for assessing whether drivers received less than minimum wage in any week or for calculating damages on a classwide basis.

This is not surprising because the damage calculations here require an individualized analysis of whether any driver should have been classified as an employee and an individualized analysis of: (1) how many hours were worked by the driver in a week; (2) how much the driver was paid for those hours; (3) what deductions, if any, were made from the driver's pay; and (4) the nature of each deduction, such as whether there was a written authorization for the deduction, in order to assess whether the driver had use of the money for a purpose of his or her own choosing. Because Plaintiff has failed to provide any viable method for performing this calculation on a classwide basis, certification should be denied. Harris, 2017 U.S. Dist. LEXIS 192363 *26-28; Blair, 309 F.Supp.3d at 1011 (decertifying class and collective action of drivers alleging misclassification because, among other things, proving damages would require "week-by-week, driver by driver evidence"). Plaintiff admitted during his deposition that he authorized all of the deductions in his pay statements, with the exception of an additional truck payment of 7 cents per mile, which he claimed he did not recall having authorized (Plf. Depo. 86:13-87:10, 87:22-88:2). However, the purchase agreement for Plaintiff's truck shows he specifically authorized that deduction. (Ex. 3 to Plf. Depo. ("PLUS $.07 A MILE TO BE APPLIED TO PRINCIPAL")). As this evidence demonstrates, calculating the damages for even one driver in one week will require extensive individual inquiries, such as an analysis of any evidence indicating the driver specifically authorized each deduction.

### 4.    Courts do not certify cases like this one.

Contrary to Plaintiff's argument that misclassification claims are "ripe for class certification," another district court recently recognized "**[c]ourts typically *deny* …**

36

**certification in [misclassification] cases, because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole.**" <u>Blair</u>, 309 F. Supp. 3d at 1003 n. 182 (emphasis added) (citing <u>Pena v. Handy Wash, Inc.</u>, 2015 U.S. Dist. LEXIS 180653 (S.D. Fla. 2015); <u>Collinge v. IntelliQuick Delivery, Inc.</u>, 2015 U.S. Dist. LEXIS 35858 (D. Ariz. 2015); <u>Rehberg v. Flowers Baking Co. of Jamestown, LLC</u>, 2015 U.S. Dist. LEXIS 36929 (W.D. N.C. 2015); <u>Carrera v. UPS Supply Chain Solutions, Inc.</u> 2012 U.S. Dist. LEXIS 192917 (S.D. Fla. 2012); <u>Andel v. Patterson-UTI Drilling Co.</u>, 280 F.R.D. 287, 290 (S.D. Tex. 2012); <u>Demauro v. The Limo, Inc.</u>, 2011 U.S. Dist. LEXIS 1229 (M.D. Fla., 2011)); <u>see also e.g.</u>, <u>Harris</u>, 2017 U.S. Dist. LEXIS 192363 (the degree of control and the opportunity for profit and loss cannot be decided on a class-wide basis); <u>Casias</u>, 2014 U.S. Dist. LEXIS 197250 (individualized evidence of each potential class member's experience on the questions of control, supervision, wait time, and back-up drivers will predominate); <u>Myers v. Hertz Corp.</u>, 624 F.3d 537 (2d Cir. 2010) (a blanket exemption policy is not, standing alone, determinative of classification issues, which require individual factual analysis to resolve); <u>Washington v. Joe's Crab Shack</u>, 271 F.R.D. 629 (N.D. Cal. 2010) (collecting cases) (rejecting a claim that wage-and-hour cases are routinely certified because "there is no rule that requires that wage-and-hour claims be certified for class treatment regardless of the evidence submitted in support of the motion for certification").

Plaintiff's citation to other certified class actions against Werner - namely, <u>Baouch v. Werner</u>, <u>Abarca v. Werner</u>, and <u>Petrone v. Werner</u> - is not helpful because none of those cases involved allegations that drivers were misclassified as independent contractors. <u>Baouch</u>, <u>Petrone</u>, and <u>Abarca</u> have nothing to do with Plaintiff's claim that he should have been classified as an employee, which is the type of claim that necessarily turns on individualized proof and for which courts "typically deny collective certification." <u>Blair</u>, 309 F. Supp. 3d at 1003 n. 182.

Plaintiff is also wrong when he argues the commonality requirement "imposes a very light burden" and class certification is appropriate any time "questions apply to all class members." (Plaintiff's Brief, p. 12). Contrary to Plaintiff's argument, the Eighth Circuit has made clear that "merely advancing a question stated broadly enough to

cover all class members is **not** sufficient." Ebert v. Gen. Mills, Inc., 823 F.3d 472, 478 (8th Cir. 2016) (emphasis added). That "there is *a* common question does not end the inquiry." Id. (emphasis in original) (internal citations omitted). "What matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." In re State Farm Fire & Cas. Co., 872 F.3d 567, 572 (8th Cir. 2017) (citing Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)) (quotation omitted). There is no common evidence here from which to assess the factors relevant to the economic realities test. Plaintiff's experience regarding Werner's alleged control over his business differs from that of other owner operators and from the terms of the Agreement. Also, each owner operator had different skills and abilities, and each driver's ability to make a profit while in the owner operator program is necessarily dictated by the driver's skills, abilities, and the decisions he or she made about how to operate the business. Likewise, the question of whether a minimum wage violation has occurred cannot be determined through common proof because the evidence required to prove whether an owner operator's deductions drove his pay below minimum wage during any particular week is highly individualized.

Plaintiff is also incorrect when he claims individual questions will be outweighed by common questions. (Plaintiff's Brief, p. 18-19). The deductions taken from each driver's pay in any given week will depend on the individual choices that driver made when he executed the relevant Contractor Operating Agreement(s) and the various decisions the driver made about how to operate his business. Each driver's individual skill and initiative must be considered, as well as each driver's different pay rates and types of pay, the deductions they elected and other business expenses they incurred, different strategies to manage expenses, different types of work performed, and different amounts of work performed by each driver. These differences are not, as Plaintiff suggests, "minor variances." (Plaintiff's Brief, p. 18). Those differences bear directly on the criteria used to determine liability, defeating class certification.

Lastly, Plaintiff is wrong when he argues the Court should "err on the side of granting class certification." (Plaintiff's Brief, p. 17). The Eighth Circuit has not endorsed this view and has made clear that the plaintiff in a putative class action must meet the

burden of "showing that the class should be certified and that the requirements of Rule 23 are met" before a class may be certified. Ebert, 823 F.3d at 477 (citing Luiken v. Domino's Pizza, LLC, 705 F.3d 370, 372 (8th Cir. 2013)). Where, as here, the Plaintiff fails to meet even one element, class certification should be denied.  See generally Coleman v. Watt, 40 F.3d 255, 258-59 (8th Cir. 1994).

### C.   Plaintiff is not an adequate class representative.

Not only are Plaintiff's claims highly individualized but Plaintiff is not an adequate class representative because his interests are not aligned with those of the putative class. Although this lawsuit was filed in May, 2018, Plaintiff has not identified a single other Werner owner operator who shares his concerns about the program. Ironically, Plaintiff argues class certification is appropriate so long as "there are other members of the class who have the same or similar grievance as the plaintiff." (Plaintiff's Brief, p. 13). However, the only other owner operators with whom Plaintiff spoke advised him they made more money as owner operators than they did as company drivers. (Plf. Depo. 136:4-19). The owner operators identified by Werner - but not deposed by Plaintiff - have similarly attested that they make more money as owner operators and do not wish to be employees. (Brayman Dec. ¶¶13, 14, 22, 23; Tew Dec. ¶¶13, 20, 21; Jackson Dec. ¶¶10, 19, 20). Plaintiff is not an adequate class representative because it is clear that other owner operators do **not** share his grievance.

Plaintiff's inability to adequately represent the members of the putative class is perhaps best illustrated through his own words. When questioned during his deposition about what he had done to investigate whether other owner operators shared his concerns, Plaintiff testified as follows:

> Q.   Have you talked to any other owner-operators about the lawsuit you filed?
> A.   No.
> **Q.   Have you talked to any other owner operators - Werner owner operators who drive for Werner about whether they have the same complaints as you do[?]**
> **A.   No.**
> **Q.   So you don't know if other owner operators want to continue as owner operators or want to be employees?**
> **A.   *I don't know about other owner operators. I only know about myself*.**
> Q.   You did mention to me earlier that you talked to some owner operators - some Werner owner operators - owner operators who drive for Werner before you became an owner operator.

> A.     Yes. That was years ago.
>
> Q.     Years ago. And they told you they made more money as owner operators than as company drivers, right?
>
> A.     Yes.
>
> *     *     *     *
>
> Q.     Have you thought about the relief you wanted? What did you want to happen?
>
> A.     Trying to make things better for owner operators.
>
> Q.     Well, you haven't talked to any other owner operators right?
>
> A.     I don't - I don't - **it's not my job to go around and talk to other owner operators.**

(Plf. Depo. 136:4-19; 138:9-18) (emphasis added).

Plaintiff also testified he does not even know what relief he seeking on behalf of himself and the putative class. When questioned about that issue during his deposition, Plaintiff stated "you have to talk to my counsel about that," and "I don't have any thoughts right now." (Plf. Depo. 137:5-138:3).

To allow Plaintiff to represent the interests of all Werner owner operators, when he acknowledges he does not know of any owner operators who share his concerns and he is unable to articulate the relief he is seeking on their behalf, runs counter to basic notions of due process. Because a judgment in a certified class action binds absent class members, the Court must "'carefully evaluate the legitimacy of the named plaintiff's plea that he is a proper class representative under Fed. R. Civ. P. 23(a).'" In re Milk Prods. Antitrust Litig., 195 F.3d. 430, 436 (8th Cir. 1999) (affirming denial of class certification because the plaintiff was not an adequate class representative) (quoting General Tel. Co. v. Falcon, 457 U.S. 147, 160 (1982)). Plaintiff's own testimony makes clear that he is not an adequate class representative. How can someone who believes it is "not [his] job to talk to other owner operators" be charged with the responsibility of litigating claims for damages on behalf of those individuals? (Plf. Depo. 138:17-18).

Plaintiff's inability to adequately represent the class is also demonstrated by the fact that he continued working as an owner operator for Werner for over a year after filing this lawsuit, until June, 2019. During that time period, Plaintiff executed a new Contractor Operating Agreement with Werner, once again agreeing he would be classified as an independent contractor. (Ex. 9 to Plf. Depo., Plf. Second Agreement). Plaintiff's conduct in actively continuing his independent contractor relationship with

Werner, while simultaneously claiming in this lawsuit that the relationship was unlawful, clearly subjects him to unique defenses, including but not limited to failure to mitigate, waiver, and estoppel. If, as Plaintiff now claims, he made less than minimum wage while working as an owner operator for Werner, it is shocking that Plaintiff would remain an owner operator and renew his owner operator contract with Werner after filing this lawsuit and that he was able to accumulate $11,000 in equity on his truck and enough extra money to put $2,000 in cash down for the truck he bought in 2019. (Plf. Depo. 111:2-12; Ex. 9 to Plf. Depo., Plf. Second Agreement; Ex. 10 to Plf. Depo.). Because Plaintiff is subject to unique defenses that may defeat his claims entirely, Plaintiff is not an adequate class representative.

Plaintiff's testimony on certain other points establishes that his experience working as an owner operator for Werner was unique and he is not an adequate class representative. Plaintiff frequently testified he "had no choice" but to take certain actions as an owner operator, despite terms in the Agreement and other documents he signed indicating those decisions were his to make. For example, after signing an Acknowledgment stating that he could remove the governor, he testified that he didn't believe he had the right to do that and did not do so. (Plf. Depo. 58:13-19; Ex. 2 to Plf. Depo., Governor Acknowledgment). Other owner operators removed the governor and the Acknowledgment makes clear that Plaintiff had that option. (Ex. 2 to Plf. Depo., Governor Acknowledgment; Brayman Dec. ¶16). Plaintiff gave similar testimony regarding his alleged belief that he was required to have his truck repaired at Werner's shops and had to purchase certain insurance from Werner. (Plf. Depo. 181:24-183:13, 53:7-22, 56:24-57:12). Because the Agreement makes clear that those choices were just options available to him, and other owner operators understood their options and made different decisions, Plaintiff cannot adequately represent the interests of other owner operators. (Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C at §§ 2-4; Brayman Dec. ¶7; Tew Dec. ¶8).

Plaintiff is also an inadequate class representative for other reasons. For example, Plaintiff's proposed class includes drivers who leased a truck from Werner, but Plaintiff never leased a truck. (Tisinger Dec. ¶12). Plaintiff has not produced evidence

regarding the lessor class. He is not an adequate representative of owner operators who leased their trucks.

**D.    Class members cannot protect their interests by opting out.**

A class action is not the superior method for adjudicating Plaintiff's claims because giving other owner operators the right to opt out of the class will not protect their interests if they disagree with Plaintiff's position in this lawsuit and does not cure Plaintiff's inadequacy as a class representative. Plaintiff took a risk by going into business for himself, but he lacked the initiative and skills to succeed. Plaintiff now wants to deprive other drivers of the ability to succeed where he failed.

Plaintiff's lawsuit seeks to eliminate Werner's ability to engage owner operators – a result which would impact the livelihoods of all owner operators, regardless of whether they opt in or opt out of a class. If the program is eliminated, owner operators will lose the freedom to control the loads they accept, choose their routes, manage their own schedules and home time, choose the trucks they drive, and make modifications to their trucks. (See Brayman Dec. ¶¶6-7, 9-10, 17, 19, 22-23; Tew Dec. ¶¶5-6, 8, 10, 15-16, 20-21; Jackson Dec. ¶¶12-13, 15-16, 19-20). Owner operator will lose the ability to increase their profits by carefully managing expenses, selecting strategic routes, and maintaining their own trucks. (See generally id.). Owner operators cannot avoid losing this autonomy and income by opting out of the class because Plaintiff's claims - by their very nature - seek to change the overall structure of Werner's owner operator program.

The fact that owner operators cannot protect their interests by choosing not to be part of this lawsuit is particularly heightened here, considering Plaintiff has not identified a single other driver who wants to join this lawsuit or who shares his concerns about the owner operator program and he believes it's "not [his] job" to worry about what other owner operators think about his claims. Plaintiff's own testimony makes clear that his grievance with Werner is a personal one and a class action is not the superior method to resolve Plaintiff's claim.

**E.    Plaintiff Has Not Shown That Any Other Drivers Desire to Opt In to an FLSA Collective Action.**

Plaintiff's request for conditional certification under the FLSA should also be denied because no other owner operators have expressed an interest in opting in to the

lawsuit. A plaintiff seeking conditional certification under the FLSA must show other workers desire to opt in. <u>Parker v. Rowland Express Inc.</u>, 492 F. Supp. 2d 1159, 1164-65 (D. Minn. 2007); <u>Martinez v. Cargill Meat Solutions</u>, 265 F.R.D. 490, 496 (D. Neb. 2009); <u>Knutson v. Blue Cross & Blue Shield of Minn.</u>, Civ. no. 08-584, 2008 WL 4371382, *3 (D. Minn. Sept. 23, 2008). Plaintiff has not offered an affidavit or opt in consent form from any other driver who wishes to join the lawsuit. To the contrary, Plaintiff admitted he has not spoken with any driver about his claims since he filed his lawsuit and he also conceded the only Werner owner operators with whom he has spoken told him they made more money as an owner operator than as a company driver. (Plf. Depo. 135:18-136:19). Other owner operators identified by Werner have confirmed they do not wish to join the lawsuit and do not want the relief Plaintiff requests here. (Brayman Dec. ¶23, Jackson Dec. ¶20, Tew Dec. ¶21). Conditional certification should be denied.

**F.    Plaintiff's Claims under Nebraska law are not suitable for class treatment.**

**1.    Plaintiff's claim under the Nebraska Wage Payment and Collection Act requires an individual analysis of each driver's Contractor Operator Agreement.**

Plaintiff's motion to certify his claim for unpaid wages under the Nebraska Wage Payment and Collection Act ("NWPCA") should also be denied. A plaintiff cannot succeed on a claim for unpaid minimum wages under the NWPCA unless the plaintiff proves the employer previously agreed to pay the unpaid wages at issue. Neb. Rev. Stat. § 48-1229(6). Thus, Plaintiff's NWPCA claim is really a breach of contract claim requiring the Court to assess whether Werner paid Plaintiff pursuant to the terms of his Contractor Operating Agreements and the relevant Addenda in effect at any given time. <u>See</u> <u>id.</u> (defining "wages" as "compensation for labor or services rendered by an employee … **when previously agreed to** and conditions stipulated have been met.") (emphasis added). Deductions from pay are permitted under the NWPCA so long as there is a written agreement to make the deduction. Neb. Rev. Stat. § 48-1230(1).

The only amounts Werner "previously agreed to" pay Plaintiff for his work as an owner operator are the rates on Addendum B to his Contractor Operating Agreement.

(Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum B (WRN-Midgett 00000014); Tisinger Dec. ¶17). Each individual owner operator authorized different deductions in writing by requesting different services from Werner in the Addenda to their Contractor Operating Agreements, such as accounting services, maintenance escrow accounts, cash advances, and insurance.  (Ex. 1 to Plf. Depo., Plf. First Agreement; Ex. 9 to Plf. Depo., Plf. Second Agreement; Ex. A to Tisinger Dec.; Brayman Dec. ¶¶11-12; Tew Dec. ¶¶11-12; Jackson Dec. ¶¶8-9).

Accordingly, Plaintiff's NWPCA claims cannot be litigated on a classwide basis because the only way to determine if Werner provided any driver the agreed-upon payment is to review each individual driver's Contractor Operating Agreement, including the Addenda and other related documents, to determine the pay the driver was entitled to and deductions requested by each driver, as well as the pay statements for each week, on a driver-by-driver basis. Plaintiff requested bobtail insurance, truck insurance, workers' compensation insurance, cash advances, and accounting services. (Ex. 1 to Plf. Depo., Plf. First Agreement at Addendum C; Ex. 6 to Plf. Depo., Pay Statements at WRN-Midgett 00000701, 00000508; Ex. A to Tisinger Depo. at WRN-Midgett 00000450, 00000452). Another driver may not have elected those deductions and may have made other deductions, such as opting into the driver legal plan, which may have lowered his or her pay elsewhere. (See Jackson Dec. ¶9). Plaintiff also took out loans to pay for truck repairs and authorized deductions to repay those loans. (Ex. 4 and 5 to Plf. Depo., Advancement Addenda (WRN-Midgett 00000019-00000024). Other drivers never took out loans for truck repairs. (Tew Dec. ¶9; Jackson Dec. ¶7).

This analysis must be performed on a week-by-week basis for every individual driver. This task is further complicated by the fact that an owner operator may change these requests at any time by executing new versions of the Addenda, so the analysis may change at any time for any given driver. (Tisinger Dec. ¶¶18-19; Tew Dec. ¶11; Jackson Dec. ¶¶8-9). There is no universal method to assess liability or compute damages without reviewing facts of each individual driver's work. In re State Farm Fire & Cas. Co., 872 F.3d 567, 572 (8th Cir. 2017) (internal citations omitted) (decertifying a class of homeowners asserting claims against their homeowner's insurance company, due to individual issues relating to the insurer's obligations to each insured and

calculation of each insured's damages); <u>Blair</u>, 309 F. Supp. 3d 977 (concluding individual issues predominated as to a claim for improper deductions where there was no common proof as to whether each individual's deductions were authorized).

Plaintiff completely ignores the elements of his claim under the NWPCA, presumably because he recognizes those elements cannot be met with common proof. Plaintiff cannot establish his NWPCA claim merely by proving he was misclassified as an employee because a claim under the NWPCA requires evidence of an agreement to pay the wages claimed. <u>Acosta v. Tyson Foods</u>, 800 F.3d 468, 473 (8th Cir. 2015) (concluding a plaintiff can only succeed on an NWPCA claim by showing the defendant previously agreed to pay the specific wages at issue and proof that those amounts may be due under another statute, such as the FLSA, does not satisfy the "previously agreed to pay" requirement for purposes of an NWPCA claim). Because each driver's NWPCA claim necessarily terms on the terms of his Contractor Operating Agreements and Addenda, the evidence offered to prove Plaintiff's NWPCA claim does not prove that claim for any other driver.

### 2.   Plaintiff's unjust enrichment claim requires individualized evidence of drivers' subjective expectations regarding pay.

Plaintiff's unjust enrichment claim should not be certified because it requires evidence of each driver's subjective expectations. Another court in this District has already refused to certify an unjust enrichment claim brought by a putative class of drivers who claimed they were not paid enough money. <u>See</u> <u>Petrone v. Werner Enters.</u>, No. 8:12CV307, 2013 U.S. Dist. LEXIS 96375, at *14 (D. Neb. July 10, 2013). To establish a claim for unjust enrichment, Plaintiff must establish that each owner operator rendered services to Werner "in expectation that [Werner] would pay" the amounts they now seek and Werner accepted the services "with knowledge of [the owner operator's] expectation." <u>Petrone</u>, 2013 U.S. Dist. LEXIS 96375, at *14-15 (D. Neb. July 10, 2013) (citing <u>Tracy v. Tracy</u>, 7 Neb. App. 143, 149, 581 N.W.2d 96, 101 (1998)). The parties' subjective expectations are highly individualized fact questions, leaving no substantial common questions with regard to these claims. <u>Petrone</u>, 2013 U.S. Dist. LEXIS 96375, at *15. Consistent with <u>Petrone</u>, Plaintiff's motion to certify the unjust enrichment claim for class treatment should be denied.

IV.     Notice by direct mail is the best method

Because this case is not appropriate for class treatment, the Court does not even need to consider Plaintiff's proposed notice and plan for providing notice. However, it is not necessary to send notice by five separate methods, as Plaintiff has requested - notice should be limited to direct mail notice. See, e.g., Huyer v. Wells Fargo & Co., No. 4:08-cv-00507, 2014 U.S. Dist. LEXIS 199182 (S.D. Iowa Oct. 17, 2014).

It is "beyond dispute that notice by first class mail ordinarily satisfies rule 23(c)(2)'s requirement that class members receive 'the best notice practicable under the circumstances.'" Huyer, 2014 U.S. Dist. LEXIS 199182 (citing Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483, 1486, 296 U.S. App. D.C. 202 (D.C. Cir. 1992); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173-75, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)). See also Reab v. Electronic Arts, Inc., 214 F.R.D. 623, 630 (D. Colo. 2002) ("Historically, first class mailing has been utilized because it provides a controlled method by which individual notification can be provided through a reliable process which ensures that proper notice is received by class members."); 3 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, Newberg on Class Actions § 8:2 (4th ed. 2007) ("When the names and addresses of most class members are known, notice by mail is usually preferred.").

There is no evidence to suggest that text or email notification is a superior or more practicable form of notification than first-class mail. See Huyer, 2014 U.S. Dist. LEXIS 199182. Court have routinely held that notification by first-class mail remains the "best notice practicable under the circumstances," even though it is possible that some mailings may be returned as undeliverable. See Decohen v. Abbasi, LLC, 299 F.R.D. 469, 479 (D. Md. 2014) (ordering notice by direct mail to all class members at their last known address and then, if returned as undeliverable, directing a search to determine the individual's correct address and to mail a second notice); Minter v. Wells Fargo Bank, N.A., 283 F.R.D. 268, 276 (D. Md. 2012) ("By providing individual notice to class members for whom Wells Fargo has current address information and also providing notice to individuals that Class Counsel is able to locate through additional tracing, the Court is confident that individual mailing will be sufficient to provide notice to the vast majority of potential class members, and thus satisfy the requirements of Rule 23(c)(2) .

. . ."); <u>Degidio v. Crazy Horse Saloon & Rest., Inc.</u>, Civil Action No. 4:13-cv-02136-BHH, 2017 U.S. Dist. LEXIS 219018, at *28-29 (D.S.C. Jan. 26, 2017) (deciding that if direct mail is returned as undeliverable, plaintiff should search for a different address using competent information). Notice, if any, should be provided by direct mail only.

## V.    Conclusion

For the reasons stated herein, Plaintiff's Motion for Class Certification should be denied.

> WERNER ENTERPRISES INC.,
> Defendant.

> By:    */s/ Joseph E. Jones*
> Joseph E. Jones, #15970
> Elizabeth A. Culhane, #23632
> FRASER STRYKER PC LLO
> 500 Energy Plaza
> 409 South 17th Street
> Omaha, NE 68102-2663
> Telephone: (402) 341-6000
> Facsimile: (402) 341-8290
> jjones@fraserstryker.com
> eculhane@fraserstryker.com
> ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court for the United States District Court for the District Court of Nebraska using the CM/ECF system this 4th day of May, 2020, which system sent notification of such filing to counsel of record.

> */s/ Joseph E. Jones*

2327013.10